Kenneth GRANT, Plaintiff,

v.

The UNITED STATES of America,
Defendant and Third-Party
Plaintiff,

George F. McGuire, as Ship's Service Officer, and Royal Indemnity Company,
Third-Party Defendants.

Civ. No. 12885.

United States District Court
E. D. New York.

June 3, 1958.

---

William H. George, Valley Stream, N. Y., for plaintiff.

Cornelius W. Wickersham, Jr., U. S. Atty., for the Eastern District of New York, Brooklyn, N. Y., Robert A. Morse, Asst. U. S. Atty., Brooklyn, N. Y., for defendant and third-party plaintiff.

Cohen, McGurk & Michels, New York City, for third-party defendants, Louis W. Mele, New York City, of counsel.

BYERS, Chief Judge.

This is a federal tort claim suit arising from an injury suffered by plaintiff, who fell on an uncovered exterior stairway forming part of the Ship's Service Store (to be called Store) located in a building which was a unit of the United States Merchant Marine Academy (to be called Academy) at Kings Point, New York. The defendant is the owner of the property, and the Academy. The date was January 5, 1952 at from 4:00 to 5:00 a. m., at which time it was raining.

The plaintiff was an employee of a news company and was making a delivery of newspapers, wrapped, covered and made up into two bundles weighing from 50 to 60 pounds each.

He carried these from a truck a few feet to the head of the twelve-step stairway in question, and because of the rain he did not attempt to slide them down a chute alongside, provided for that purpose, since its surface was wet and thus would not admit of such a use. Instead he carried the bundles, one on his right shoulder and the other in his left hand, and when he had descended about nine steps he mistakenly assumed that he had reached the bottom; this caused him to step forward instead of down, with the result and he fell, struck his right knee and so injured the patella as to suffer the injury for which he now seeks recovery.

His case is based upon the failure of overhead lights to be operating; one was at the top of the stairway and the other adjacent to a doorway leading from the platform at the foot. The lights are best shown in the diagrams forming part of U. S. Exhibit A of the Requests to Admit filed by the United States on February 5, 1958, addressed to both the plaintiff and to McGuire, a Ship's Service Officer, who is a third-party defendant.

The stairway led from the ground level to an entrance to the Store which was operated by McGuire pursuant to the provisions of certain regulations issued by the War Shipping Administration (U. S. Exhibit B) which is a branch of the Department of Commerce of the U. S. A.

The status of McGuire for present purposes, will be later discussed.

The foregoing recital as to the fact and nature of plaintiff's injury, and the time and place where it occurred, and the prevailing weather conditions, are not in dispute.

The issues of fact which will require decision are:

1. *Were the said lights in operation on the morning of January 5, 1952 at from 4:00 to 5:00 o'clock?*

It is found that they were not, for these reasons:

Such is the plaintiff's testimony, and no one has contradicted him. Mrs. Rooney, who worked for the Store and whose job involved turning a switch in the Store to put the lights on when she closed and locked the door leading to the Store on the late afternoon or evening of January 4th, could not state more than her customary practice in that respect; she could not swear that she had turned on the lights on this occasion.

Simpkins, a porter employed in the Store, could not remember as to whether the lights were operating when he came to work early in the morning of January 5th.

McCormack, a patrol guard not connected with the Store, whose duty it was to generally inspect the premises, could not remember as to this particular fact.

It is the present opinion that the plaintiff's affirmative testimony has not been impaired by all that these of the defendant's witnesses were able to depose.

■ 2. *Was the plaintiff guilty of contributory negligence in carrying two bundles at a time instead of making separate trips for each?*

This query cannot be lightly brushed aside. It may be a fair inference that if only the plaintiff's left arm had been engaged, he could have used his right hand to grasp the chute at the instant he became aware of his error in sensing his supposed arrival at the bottom of the stair, to prevent the fall and attendant injury. If such is merely the teaching of hindsight, it can scarcely be urged against him that it was an act of negligence which played a part in the happening.

However it is not the supposed (by him) unavailability of the chute which caused him to fall; if it had been, and he neglected, as the result of his exercise of an unwise choice, to use the means that were actually there, his own negligence would thus defeat his recovery. His theory, however, is that because of the darkness which is found to have prevailed, he missed his footing, and this would not have happened had the lights been working.

He said that the right side of his body as he descended was against the chute which he was so using as a guide. He also said that he had been making these deliveries two or three times a week for about fifteen months, and what he did on this particular morning was in accordance with his custom when the chute was wet because of inclement weather, whereby the bundles would not slide. This is convincing for the obvious reason that the chute would serve him as a labor saving device, if the bundles and chute had been dry.

No contention is made that it was contributory negligence for Grant to descend the stairway under the prevailing conditions of darkness; if it had been so urged, the answer would lie in his testimony that the light had been off about half the time during his fifteen months' experience, and that even under these conditions and on rainy nights, it had been his custom to proceed as he did on this occasion.

He also testified that he had complained to Simpkins, and at the office maintained at the entrance gate, when the lights were not working. As to this, Simpkins contradicted him, as did Cornelis, who was stationed at the Gate House Office.

A choice is made in favor of the plaintiff's testimony on this subject, for the reason that the porter Simpkins could not be expected to admit that he had paid serious attention to such complaints because if he had, and still the condition was not corrected as of the morning in question, a fault on the part of someone would have been exposed. Cornelis' testimony comes down to the fact that according to his recollection this plaintiff had never spoken to him about the absence of lights on this stairway.

As above stated, the court accepts Grant's testimony because he was a convincing witness.

3. *Was there a duty to light the stairway?*

This subject does not admit of extended discussion. Light fixtures were provided as the diagram shows, and of course not for ornamental purposes; 100-watt bulbs were supplied by direction of the Public Works Officer, one Louis F. Diedrick, whose precise official duties were not clarified in the record. This decision is based upon the assumption that since he was stationed at the Academy on the date in question and was head of the Department of Public Works, he was attached to the Department of Commerce and functioned as an official thereof.

■ Since liability as asserted by the plaintiff, depends upon the law of the State of New York (Title 28 U.S.C. § 1346(b)) as is recognized in Ira S. Bushey & Sons v. U. S., 2 Cir., 172 F.2d 447, at 448, it becomes necessary to consult that law.

The Government relies for its statement on this subject on the case of Kimbar v. Estis, 1 N.Y.2d 399, 153 N.Y.S.2d 197, 135 N.E.2d 708, 709, in which the facts are so remote from these that they need not be recited. That opinion states in part:

"* * * Second, the rule is well settled at *common law* that there is no duty of an owner to light common ways absent some defective condition, unusual hazard or peculiar danger. * * *

"Upon examining the cases cited above, we find no distinction with respect to the applicability of that common-law rule as among trespassers, visitors, invitees, licensors, tenants or guests. * * *

"In sum, then, no duty to illuminate the path was owed here as to plaintiff under the circumstances shown by his proof."

The closing sentence means that the state courts themselves might well recognize the existence of the duty to illuminate a given area, and the evidence here shows that such a duty was not only recognized, but in part performed.

The witness Rooney testified:

"Well, I had to see that everything was taken care of, and when night came, that the lights were on, and I locked up, and I left.

"Q. Did you sometimes turn on the lights earlier, before leaving? A. Well, before it got dark we turned on the light on the outside, because we used that place for empty cartons and to throw out garbage, and all that.

"Q. And you used it during the day? A. Yes.

"Q. And when it got dark, did you turn the lights on? A. Well, I would, or whoever else was working there at the counter. * * * Or other employees behind the counter, but I checked before I left every night. * * *

"That particular night I could not swear. And we always have a light in the canteen too, every night."

The latter remark refers to the interior of the building containing the Store.

■ Coupled with what has been said about the furnishing of 100-watt bulbs, the duty to illuminate this stairway at night was recognized and usually performed; that is sufficient to distinguish this case from those governed by the principles of common law as enunciated in the Kimbar case; this means that the pending question is answered in the affirmative; and the finding is to that effect.

4. *Did the foregoing duty pertain to the defendant?*

The answer is not automatic and depends upon the status of McGuire, who hired Mrs. Rooney and Simpkins to assist him in the performance of his duties.

The former, who has been made a third-party defendant at the instance of the United States, was a lieutenant attached to the United States Merchant Marine on January 5, 1952; this means that he was paid by the United States Government.

The Store, which was operated in a Government building, was conducted for the use of the cadets. The proceeds of

sales made in the Store went into the "Welfare fund that was applied toward the cadets and military personnel of the Academy."

Mrs. Rooney and Simpkins were paid from the proceeds of the business conducted by the Store; as to the latter, the provisions of the Regulations (U. S. Exhibit B) control.

Those regulations as to Section B, which defines the duties of the Ship's Service Officer, leave no room for doubt that his functions are official and his duties are those of an officer of the United States Government.

The case of Standard Oil Co. v. Johnson, 316 U.S. 481, 62 S.Ct. 1168, 1170, 86 L.Ed. 1611, decides that "post exchanges as now operated are arms of the government deemed by it essential for the performance of governmental functions. They are integral parts of the War Department, * * *. In concluding otherwise the Supreme Court of California was in error."

No distinction in principle has been pointed out for the defendant, between this Ship's Service Store and the Army Post Exchange discussed in the above case, nor does any such distinction occur to this court. This means that the Ship's Service Store was an instrumentality of the United States Government operated by the defendant McGuire, and accordingly the defendant is legally responsible for any error of omission or commission in the discharge of his duties as Ship's Service Officer which resulted in damage to this plaintiff.

The defendant relies upon the decision of Faleni, etc. v. United States, D.C., 125 F.Supp. 630, 632, decided in this district. That case dealt with a person who may be likened to Mrs. Rooney as to status, and in the opinion the court says (after examining the Johnson case, supra):

"Granting that, it does not necessarily follow that the plaintiff was an employee of the defendant."

If Mrs. Rooney were suing the defendant to recover damages for an injury attributable to her employer, the decision would constitute an authority to the effect that no recovery could be had by her against the United States.

I do not think that the decision compels a holding here that McGuire was not conducting a governmental activity, and this decision will proceed on the theory that he was.

The case of Daniels v. Chanute Air Force Base Exchange, etc., and the United States of America, D.C., 127 F.Supp. 920, decided in the Eastern District of Illinois, should be consulted as presenting a view contrary to that stated in the Faleni case.

The finding is that the defendant is legally responsible to the plaintiff for any injury suffered by him as the result of a failure to perform the duty of maintaining lights upon the stairway in question.

5. *Is the defendant entitled in the event of recovery against it, to relief under the third party complaint?*

As to McGuire, it is clear that he did not fail to perform any duty as an individual, which the law recognizes as owing to the plaintiff; his omission was that which pertained to his official duties as heretofore explained, and for this reason the Government has no cause of action against him. Cf. Carson v. Behlen, D.C., 136 F.Supp. 222, at page 224.

As to the Royal Indemnity Company, the case of United States v. Gilman, 347 U.S. 507, 74 S.Ct. 695, 98 L.Ed. 898, is a complete answer in the negative. The opinion contains the following:

"The single question in the case is whether the United States may recover indemnity from one of its employees after it has been held liable under the Federal Tort Claims Act, (Reference) for the negligence of the employee. * * * The District Court found that Darnell's injuries were caused solely by the negligence of respondent, acting within the scope of his employment. It entered judgment against the United States for $5,500 and judgment over

694

for the United States in the same amount. The Court of Appeals reversed the judgment against respondent by a divided vote. * * *

"Petitioner's argument is that the right of indemnity, though not expressly granted by the Tort Claims Act, is to be implied. A private employer, it is said, has a common-law right of indemnity against an employee whose negligence has made the employer liable. The Tort Claims Act, by imposing liability on the United States for the negligent acts of its employees, has placed it in the general position of a private employer. Therefore, it should have the comparable right of indemnity against the negligent employee which private employers have. * * *

"The present case is quite different. We deal not with the liability of the United States, but with the liability of its employees. The Tort Claims Act does not touch the liability of the employees except in one respect: by 28 U.S.C. § 2676, 28 U.S.C.A. § 2676, it makes the judgment against the United States 'a complete bar' to any action by the claimant against the employee. And see § 2672.

"* * * The right of the employer to sue the employee is a form of discipline. Perhaps the suits which would be instituted under the rule which petitioner asks would mostly be brought only when the employee carried insurance."

The opinion concludes with the observation that any change in the terms of the Federal Tort Claims Act which would provide for such a third party recovery as is here sought, is for Congress and not the courts to control. The judgment was affirmed.

6. *Is the plaintiff barred from recovering more than ten weeks' pay at the rate of $93.75 per week, by virtue of the provisions of Title 28 U.S.C. § 2675?*

The statutory provision may be thus summarized:

No action shall be instituted upon a claim against the United States "which has been presented to a federal agency, for money damages for injury * * * caused by the negligent or wrongful act or omission of an employee of the government while acting within the scope of his authority, unless such federal agency has made final disposition of the claim."

Withdrawal of such a claim within fifteen days is permitted under the second paragraph, which contains the following language:

"Action under this section shall not be instituted for any sum in excess of the amount of the claim presented to the federal agency, except where the increased amount is based upon newly discovered evidence not reasonably discoverable at the time of presenting the claim to the federal agency, or upon allegation and proof of intervening facts, relating to the amount of the claim."

The question directs attention to a letter written by the plaintiff under date of March 21, 1952 addressed to the Academy, which states at the outset that it is written on advice of Capt. Gellsher, whose status has not been disclosed in this record.

The plaintiff describes the happening in some detail, and the fact that he had received medical attention and certain incidents thereof;

That he returned to his job on March 17, 1952, and that he had been out of work for ten weeks, his actual weekly salary being $93.75, and a statement of reasons why a financial hardship has ensued;

Also that he has been through a great deal of pain and suffering, and has sustained a permanent partial disability.

The letter closes thus:

"I don't feel that I want to run to an attorney without giving you a fair chance and eliminate a lot of court litigation, with a loss of time of yours and mine, but I do expect in all fairness that a reasonable settlement can be made to the satisfac-

tion of both of us, without making an issue of it.

"I trust that all of the above information is complete and if not, do not hesitate in requesting more if necessary.

"Hoping for an early reply, I am etc."

The foregoing at best is but an informal statement of a grievance, the cause and incidents thereof, and a desire to avoid litigation in connection therewith.

The finding is that it is not a claim which has been presented to a federal agency within the contemplation of the cited section of the statute, not only because of its informal nature but because it does not assert a claim in any definite amount upon which a federal agency could act.

The testimony does not indicate that any reply was made to his letter.

There remains to consider therefore only the amount of damages properly to be awarded to the plaintiff, and in that connection the following items are to be enumerated:

| | |
|---|---|
| Loss of earnings (conceded) 10 weeks at $110. per week | $1,100.00 |
| Medical expenses (not contested) | 128.49 |
| Permanent partial disability, namely 10% of flexion of the injured knee | 2,000.00 |

*Comment:* The plaintiff was able to resume his calling, but he could not follow it with the same facility as before his accident.

| | |
|---|---|
| Pain and suffering | 1,500.00 |

*Comment:* The difficulty in estimating such an item as this is too well recognized to require comment, and the figure mentioned is at best an approximation which it is hoped is compensatory in character.

| | |
|---|---|
| | $4,728.49 |

It is found therefore, that the plaintiff is entitled to recover judgment against the defendant for the abovementioned sum of $4,728.49, and that the claims advanced by the defendant as third-party plaintiff are dismissed, and that judgment accordingly should be entered.